**No. 26-20015**

---

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

UNITED STATES OF AMERICA,
*Plaintiff–Appellee*;

v.

KAMAIGA GHOLAR,
*Defendant–Appellant*.

---

On Appeal from the United States District Court
For the Southern District of Texas, Houston Division
No. 4:24-CR-371

---

BRIEF OF PLAINTIFF–APPELLEE

---

AARON F. REITZ
United States Attorney

CARMEN CASTILLO MITCHELL
Chief, Appellate Division

JASON SMITH
Assistant United States Attorney
1000 Louisiana, Suite 2300
Houston, Texas 77002
(713) 567-9102

ATTORNEYS FOR APPELLEE

## STATEMENT REGARDING ORAL ARGUMENT

The facts and legal arguments are adequately presented in the briefs and record; oral argument would not significantly aid the decisional process, and the United States does not request oral argument. Fed. R. App. P. 34(a)(2)(C).

# TABLE OF CONTENTS

**Page**

STATEMENT REGARDING ORAL ARGUMENT .................................i

TABLE OF AUTHORITIES .................................................................iv

STATEMENT OF JURISDICTION ......................................................1

STATEMENT OF THE ISSUE ............................................................1

STATEMENT OF THE CASE ...........................................................1

I. Gholar is indicted for her part in a scheme to fraudulently obtain a bail bond on behalf of criminal defendant Nicholas Yoder. ..................................................1

II. Gholar is convicted following a bench trial. ..........................3

SUMMARY OF ARGUMENT ............................................................10

ARGUMENT ....................................................................................11

Sufficient evidence supported Gholar's convictions for aiding and abetting wire fraud and conspiring to commit wire fraud. ....11

I. Standard of review-de novo, but highly deferential to the verdict ...........................................................11

II. Based on the trial evidence, the district court could rationally find that Gholar both aided and abetted and conspired to commit wire fraud in connection with the bail-bond fraud scheme. ...............................13

A. Legal standards for proving aiding-and-abetting, and conspiring to commit, wire fraud. .................................................................13

**TABLE OF CONTENTS, cont'd**

**Page**

B. Legal standards regarding interstate wire transmissions. .......... 15

C. Applying these legal standards, Gholar's sufficiency challenge fails. .......... 18

CONCLUSION .......... 22

CERTIFICATE OF SERVICE .......... 23

CERTIFICATE OF COMPLIANCE .......... 24

## TABLE OF AUTHORITIES

**Case(s)** **Page(s)**

*Pereira* v. *United States*, 347 U.S. 1 (1954) .......... 15

*Trabucco* v. *Rivera*, 141 F.4th 720 (5th Cir. 2025) .......... 12

*United States* v. *Allen*, 76 F.3d 1348 (5th Cir. 1996) .......... 17

*United States* v. *Austin*, 585 F.2d 1271 (5th Cir. 1978) .......... 15

*United States* v. *Blankenship*, 746 F.2d 233 (5th Cir. 1984) .......... 17

*United States* v. *Cabello*, 33 F.4th 281 (5th Cir. 2022) .......... 11

*United States* v. *Daniel*, 957 F.2d 162 (5th Cir. 1992) .......... 11

*United States* v. *del Carpio Frescas*, 932 F.3d 324 (5th Cir. 2019) .......... 12, 13, 16

*United States* v. *Dowl*, 619 F.3d 494 (5th Cir. 2010) .......... 16

*United States* v. *Fatani*, 125 F.4th 755 (5th Cir. 2025) .......... 15, 16

*United States* v. *Jimenez*, 158 F.4th 628 (5th Cir. 2025) .......... 11

*United States* v. *Jimenez-Elvirez*, 862 F.3d 527 (5th Cir. 2017) .......... 13

*United States* v. *Knowlton*, 993 F.3d 354 (5th Cir. 2021) .......... 12

*United States* v. *Lane*, 474 U.S. 438 (1986) .......... 17, 20

*United States* v. *Mann*, 493 F.3d 484 (5th Cir. 2007) .......... 17

*United States* v. *Mills*, 199 F.3d 184 (5th Cir. 1999) .......... 17

*United States* v. *Neal*, 951 F.2d 630 (5th Cir. 1992) .......... 14

**TABLE OF AUTHORITIES, cont'd**

**Case(s)** **Page(s)**

*United States* v. *Richards*, 204 F.3d 177 (5th Cir. 2000), *overruled on other grounds by United States* v. *Cotton*, 535 U.S. 625 (2002) ........ 16

*United States* v. *Rosas-Fuentes*, 970 F.2d 1379 (5th Cir. 1992) ........ 11

*United States* v. *Sanders*, 952 F.3d 263 (5th Cir. 2020) ........ *passim*

*United States* v. *Scott*, 892 F.3d 791 (5th Cir. 2018) ........ 15

*United States* v. *Stalnaker*, 571 F.3d 428 (5th Cir. 2009) ........ 14

*United States* v. *Tovar*, 719 F.3d 376 (5th Cir. 2013) ........ 12

*United States* v. *Wheeler*, 802 F.2d 778 (5th Cir. 1986) ........ 12

*United States* v. *Yusuf*, 57 F.4th 440 (5th Cir. 2023) ........ 12, 13

**Statutes and Rules**

18 U.S.C. § 2 ........ 14, 15

18 U.S.C. § 2(a) ........ 14

18 U.S.C. § 1343 ........ 13

18 U.S.C. § 3231 ........ 1

28 U.S.C. § 1291 ........ 1

Fed. R. App. P. 4(b)(1)(A) ........ 1

Fed. R. App. P. 4(b)(2) ........ 1

# TABLE OF AUTHORITIES, cont'd

**Statutes and Rules** **Page(s)**

Fed. R. App. P. 34(a)(2)(C) ........................................................................i

Fed. R. Crim. P. 29 ........................................................................9, 10, 11

5th Cir. R. 28.2.2 ........................................................................1

## STATEMENT OF JURISDICTION

The district court had jurisdiction in this criminal case under 18 U.S.C. § 3231. Gholar appeals from the judgment imposed on January 7, 2026, and entered on January 20, 2026. ROA.422-24. Gholar timely filed her notice of appeal on January 7, 2026. ROA.420; Fed. R. App. P. 4(b)(1)(A) and (b)(2). This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

**Has Gholar cleared the high bar of showing that the trial evidence was insufficient to support her convictions for aiding and abetting and conspiring to commit wire fraud?**

## STATEMENT OF THE CASE

### I. Gholar is indicted for her part in a scheme to fraudulently obtain a bail bond on behalf of criminal defendant Nicholas Yoder.

Gholar and 52 others were charged in a multi-count superseding indictment for their respective roles in a scheme to fraudulently obtain bail bonds for criminal defendants charged in Harris County, Texas. ROA.171-97, 343-45.[1] The indictment alleged that employees of Aable

---

[1] "ROA" refers to the record on appeal, which is cited in accordance with 5th Cir. R. 28.2.2. For sealed documents that have a single page in the record on appeal with a link to the document on the district court DCN, documents are cited to their ROA placeholder page, with pincites to relevant pages (p.) within the document, using the

Bail Bonds conspired with others to recruit straw co-signers for the bonds and to falsify (and to obtain falsified) financial and employment records to support the co-signers' applications. ROA.175-76, 343-45. The indictment alleged, inter alia, that the Aable employees and other defendants defrauded Aable's insurer, Financial Casualty & Surety, by inducing it to issue surety bonds that it would not have issued if truthful financial and employment information for the cosigners had been submitted. ROA.176; ROA.344, 352 (district court findings of fact and conclusions of law noting that "a scheme to fraudulently obtain financial guarantees from a lender to a third party can form the basis of a wire fraud conviction").

The charges in the indictment related to bonds that were fraudulently obtained on behalf of 11 criminal defendants. ROA.171-97. Those charged in the indictment included Aable employees Mary Brown and Oscar Wattell, the criminal defendants on whose behalf the bonds were fraudulently obtained, and multiple cosigners who obtained and/or used fraudulent information to obtain the bonds. ROA.171-97. Gholar

district court's page numbers at the top of each page or to time markers for specific portions of audio recordings.

was charged in two counts arising from her participation in the scheme to obtain a bond on behalf of Nicholas Yoder. ROA.179-81.

Count Nine charged Gholar, Mary Brown, Nicholas Yoder, Pamela Yoder (Nicholas Yoder's mother and a co-signer on his bond), Deleon Borders (another co-signer on Yoder's bond), and others, with conspiring to commit wire fraud from in or about September 2021 through in or about January 2022, for their roles in fraudulently obtaining a bond securing Nicholas Yoder's release. ROA.179. Count 14 charged Gholar with wire fraud and aiding and abetting wire fraud based on the interstate wire transmission, on January 18, 2022, of a falsified paystub that was submitted in support of a co-signer's application for Nicholas Yoder's bond. ROA.180.

## II. Gholar is convicted following a bench trial.

Gholar proceeded to a bench trial along with two codefendants charged for their roles regarding other fraudulent bonds.[2] ROA.508-1463. After that trial, the district court found Gholar guilty on both counts and

[2] James Bateson was charged in counts 39 and 42 for his role in fraudulently obtaining a bond for James Palladina. ROA.192-94. Katherine O'Brien was charged in counts 45 and 46 for her role in fraudulently obtaining a bond for Roemello Burros. ROA.194-95.

issued detailed findings of fact and conclusions of law.[3] ROA.343-60.

As set forth in the district court's findings, the trial evidence showed that "Gholar created cosigner applications and related documents, on behalf of herself and others, to apply for a bond from Aable that would release Nicholas Yoder from Harris County Jail." ROA.351 (citing ROA.1487-98, 1502 and ROA.1499, 1503 (demonstratives)). Among that evidence, in recorded telephone conversations, Gholar told Nicholas Yoder that she would create and submit to Aable cosigner applications containing false information from his mother, Pamela Yoder, and Deleon Borders. ROA.351 (citing ROA.932-36, 1547).

The Government introduced copies of the Pamela Yoder and Deleon Borders cosigner applications containing false information that Gholar sent to Aable, as well as falsified supporting documents like pay stubs that she submitted. ROA.1486-96. It also introduced records of a CashApp payment that Gholar made to codefendant Jeanine Victor for falsified pay stubs in support of the co-signers' applications. ROA.354 (citing ROA.1500, 924, 940, 1160-67). Additionally, the payroll

[3] On appeal, Gholar does not dispute the accuracy of the district court's description of the evidence presented at trial.

administrator for the purported employer shown on Pamela Yoder's falsified pay stub testified that the stub was "not one of our pay statement[s]" and was "completely not from our software." ROA.903; ROA.1484 at 22–23.

Gholar's own trial testimony also established that she knew the cosigner applications she submitted contained false information and that the pay stubs she submitted "were fake." ROA.354. Gholar "testified on cross-examination that she knew Borders's cosigner application contained false statements when she sent it to Aable" and she "acknowledged that she had stated in a recorded phone conversation" admitted at trial, "that, at least for the family information in the cosigner applications, only the applicant's name had to be correct and that the rest of the family information could be false." ROA.354 (citing ROA.1339, 1349). The trial evidence also included a recorded conversation in which Nicholas Yoder told Gholar that the cosigners' pay stubs would be "cooked up." ROA.354 (citing ROA.1479 at 2).

In a recorded conversation admitted at trial, Mary Brown, the Aable employee who told Nicholas Yoder that she would accept fake pay stubs in the application supporting his bond, explained that his bond

application needed cosigners who could show a combined yearly income equal to the value of his $335,000 bond. ROA.355 (citing ROA.1547 at 08:40–09:35). She further explained that the cosigners' employment information and pay stubs were necessary to "bypass the insurance." ROA.355 (citing ROA.1547 at 13:00–13:41).

An attorney for Financial Casualty, Ken Good, testified that Financial Casualty is an insurance company that operates as the largest bail underwriter in the United States. ROA.1057. Aable was licensed through Financial Casualty and acted as its agent. ROA.351 (citing ROA.1066-67); ROA.1074-76. Good testified that insurers like Financial Casualty take on substantial risk in issuing such surety bonds and that they rely on accurate information in bond applications, including information about co-signers, to assess that risk. ROA.356 (citing ROA.1058-60, 1063-65, 1092-96). As Financial Casualty's agent, Aable was responsible for summarizing and reporting such risk information to Financial Casualty. ROA.356 (citing ROA.1058-60, 1063-65, 1092-96). "Good testified that cosigners' 'employer information and income' are the 'two most important pieces of information' that the surety company receives." ROA.356 (citing ROA.1095-96). He also testified that, having

reviewed the bond materials for Nicholas Yoder, Financial Casualty would not have approved his $335,000 bond had it included accurate financial information for his co-signers instead of the falsified information that Gholar and Aable had submitted. ROA.356 (citing ROA.1078-79).

Good also testified about Aable's obligation to maintain records regarding bonds on behalf of Financial Casualty. ROA.1062-65, 1070-71. He explained that bondsmen like Aable were fiduciaries for Financial Casualty. ROA.1062, 1080-82. As such, they were obliged to retain records of bonds, including co-signer agreements[4] and documentation, "in trust" for Financial Casualty. ROA.1062-65. He testified that Financial Casualty "[a]bsolutely" expected those records to be true and accurate. ROA.1063. Under their contract with Financial Casualty, bondsmen like Aable were required to keep the records five years, however under Texas law, they were "required to keep them for four years after the criminal case is resolved." ROA.1062, 1081. Good testified that Aable retained cosigner agreements for large bonds (like Nicholas Yoder's) both "in a

[4] Much of Good's testimony refers to "indemnity agreements," which he testified was a "synonym" for co-signer agreements. ROA.1065.

paper file" and "in their office management software system[,]" Bond Pro, which is located in Georgia. ROA.1070-71, 1081-82.

Good also described how, after the FBI executed a search warrant and seized Aable's paper records from their offices, Financial Casualty was concerned with whether Aable remained complaint with Texas law requiring bond files to be maintained in the county where they are issued. ROA.1090. That concern triggered an audit during which Financial Casualty "got access to [Bond Pro] . . . [to] do a random audit to see if the documents maintained there satisfied the requirements of the statute," after which Financial Casualty "concluded that they did." ROA.1090.

A corporate representative from Bond Pro testified that Bond Pro "is software for bail bond companies to manage their bonds that they write." ROA.792. She confirmed that Aable had been a Bond Pro user since 2019. ROA.792. She further testified that Bond Pro is located in Georgia and that when a Bond Pro user uploaded documents, they would be stored on Bond Pro's servers in Georgia. ROA.793. She also confirmed that Aable had uploaded five files related to Nicholas Yoder's bond, including the falsified co-signer applications and agreements for Pamela Yoder and Deleon Borders, to Bond Pro's server on January 18, 2022.

ROA.794-96 (referencing ROA.1502); ROA.914-32.[5]

At the close of the government's case, Gholar's codefendant, Katherine O'Brien, moved for a judgment of acquittal under Rule 29, arguing, inter alia, that "any acts committed by Ms. O'Brien were done locally in Houston, Texas and completed before the information was uploaded to the Bond Pro server" and, thus, that "[t]he government failed to prove that [her] attempts to assist [Roemello] Burros get a bond were transmitted in interstate commerce in furtherance of the alleged deceit." ROA.1312-14, 1691, 1697. When asked by the district court, "I assume you want to adopt the motion on behalf of your client[,]" Gholar's counsel responded, "I do, Your Honor, with some additions." ROA.1325-26. Counsel then argued that a judgment of acquittal was required because "[t]he unequivocal evidence was that [Gholar] submitted a truthful application" and there purportedly was "no evidence of moral turpitude on her part." ROA.1326-27. The district court denied the Rule 29 motions,

---

[5] Although the Bond Pro representative testified that Bond Pro "do[es] not look at our clients' files" (ROA.796), an investigating agent testified that he had reviewed the files about which the representative testified, which investigators obtained from Bond Pro pursuant to a search warrant, and that the files included the co-signer applications and agreements for Pamela Yoder and Deleon Borders. ROA.914-32. The government introduced, as a demonstrative exhibit, a chart correlating the fraudulent co-signer documents with the file names obtained from Bond Pro. ROA.142-43 (referencing ROA.1503).

stating "Obviously, you can make a motion at the end of all the evidence." ROA.1328. Although Gholar testified and presented other witnesses, she did not renew her Rule 29 motion at the close of all evidence. ROA.1329-62.

The district court found Gholar guilty on both counts against her: Count Nine, conspiring to commit wire fraud; and Count Fourteen, aiding and abetting wire fraud. ROA.422. It sentenced her to time served on both. ROA.423.

## **SUMMARY OF ARGUMENT**

Based on the evidence described above, a reasonable fact finder could conclude that Aable's interstate transmission to Bond Pro of the fraudulent co-signer materials that Gholar provided furthered the fraud scheme by, at minimum, concealing the fraud and lulling Financial Casualty into believing that Aable was operating in good faith and in the normal course of business. Gholar's arguments to the contrary fail to apply the highly deferential standard of review applicable to sufficiency claims, fail to account for her liability as an aider and abettor, or rely on characterizing the evidence in a light most favorable to her argument, rather than the light most favorable to the verdict. They should be

rejected.

## ARGUMENT

**Sufficient evidence supported Gholar's convictions for aiding and abetting wire fraud and conspiring to commit wire fraud.**

### I. Standard of review-de novo, but highly deferential to the verdict

Even preserved sufficiency-of-the-evidence challenges are reviewed under a standard that places "a heavy thumb on the scale in favor of the verdict." *United States* v. *Cabello*, 33 F.4th 281, 288 (5th Cir. 2022).[6] Such claims are reviewed de novo, but with "substantial deference" to the verdict. *United States* v. *Jimenez*, 158 F.4th 628, 632 (5th Cir. 2025). Thus, this Court will uphold the verdict "as long as a reasonable trier of fact could conclude that the elements of the offense were established

[6] The government assumes, arguendo, that the standard for a preserved sufficiency challenge applies here. To preserve a sufficiency argument during a jury trial, a defendant must renew their motion for a judgment of acquittal at the close of all evidence. *United States* v. *Daniel*, 957 F.2d 162, 164 (5th Cir. 1992). Failure to do so waives the sufficiency challenge and "appellate review is limited to determining whether there was a manifest miscarriage of justice, that is, whether the record is devoid of evidence pointing to guilt." *Id.* (internal quotation omitted). That standard, however, does not apply to a defendant convicted at a bench trial, who is not required to renew his motion for a judgment of acquittal at the close of all evidence. *United States* v. *Rosas-Fuentes*, 970 F.2d 1379, 1381 (5th Cir. 1992). Additionally, although this Court does not allow an appellant to "adopt evidentiary sufficiency arguments from his co-defendant's appellate brief[,]" it has, for error-preservation purposes, allowed a defendant to adopt a co-defendant's Rule 29 arguments in the district court. *See id.*

beyond a reasonable doubt."[7] *Id.* (internal quotation omitted); *United States* v. *Yusuf*, 57 F.4th 440, 444 (5th Cir. 2023) (same).

Under this standard, "the question is not whether this [C]ourt believes that the evidence at the trial established guilt beyond a reasonable doubt[,]" but "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States* v. *del Carpio Frescas*, 932 F.3d 324, 328 (5th Cir. 2019) (emphasis added and internal quotation omitted); *see also United States* v. *Knowlton*, 993 F.3d 354, 357 (5th Cir. 2021) (viewing evidence in light most favorable to prosecution in sufficiency appeal following bench trial).

[7] In the context of a bench trial, this standard is sometimes phrased in terms of whether the verdict "is supported by substantial evidence." *See, e.g., United States* v. *Tovar*, 719 F.3d 376, 388 (5th Cir. 2013) ("When a defendant challenges a bench-trial conviction on sufficiency-of-the-evidence grounds, we focus on whether the finding of guilt is supported by substantial evidence, *i.e.*, evidence sufficient to justify the trial judge, as the trier of fact, in concluding beyond a reasonable doubt that the defendant is guilty." (quotations omitted)). The substantial-evidence and any-rational-trier-of-fact phrasing, however, both refer to the same substantive standard. *See United States* v. *Wheeler*, 802 F.2d 778, 782 (5th Cir. 1986) ("This Court must affirm the jury's verdict if it was supported by substantial evidence so that a reasonable trier of fact could have found guilt beyond a reasonable doubt."); *see also Trabucco* v. *Rivera,* 141 F.4th 720, 727 (5th Cir. 2025) (in appeal from civil trial, "[t]his court cannot reverse a denial of a motion for judgment as a matter of law unless the jury's factual findings are not supported by substantial evidence[,] . . . we will reverse . . . only if the evidence points so strongly and so overwhelmingly in favor of the nonmoving party that no reasonable juror could return a contrary verdict." (internal citations and quotations omitted)).

In addition to viewing the evidence in the light most favorable to the prosecution, this Court "draw[s] all reasonable inferences from the evidence to support the verdict." *Yusuf*, 57 F.4th at 444 (internal quotation omitted) (citing *United States* v. *Jimenez-Elvirez*, 862 F.3d 527, 533 (5th Cir. 2017)). This standard sets "a high bar" for an appellant to overcome. *Id.*

## II. Based on the trial evidence, the district court could rationally find that Gholar both aided and abetted and conspired to commit wire fraud in connection with the bail-bond fraud scheme.

### A. Legal standards for proving aiding-and-abetting, and conspiring to commit, wire fraud.

In a prosecution for wire fraud in violation of 18 U.S.C. § 1343, "the government must prove that (1) a scheme to defraud exists, (2) the defendant used wire communications in interstate or foreign commerce to further that scheme, and (3) the defendant had specific intent to defraud." *del Carpio Frescas*, 932 F.3d at 329. "Once membership in a scheme to defraud is established, a knowing participant is liable for any wire communication which subsequently takes place or which previously took place in connection with the scheme." *United States* v. *Sanders*, 952 F.3d 263, 277 (5th Cir. 2020) (internal quotation omitted) (citing *United*

*States* v. *Stalnaker*, 571 F.3d 428, 436 (5th Cir. 2009)).

To sustain a conviction, "[t]he government must show that the defendant participated in the scheme to defraud, not that he took part in every aspect of that scheme." *Sanders*, 952 F.3d at 277 (internal quotation omitted). Indeed, a defendant may be convicted of wire fraud for aiding and abetting the offense rather than by personally completing each element themselves. *Sanders*, 952 F.3d at 277. Aiding and abetting. "'is not a separate offense, but it is an alternative charge in every indictment, whether explicit or implicit.'"[8] *Id.* (quoting *United States* v. *Neal*, 951 F.2d 630, 633 (5th Cir. 1992)). To sustain a conviction for aiding and abetting wire fraud in the context of this case, the government needed to show that (1) wire fraud was "committed by someone," and that (2) Gholar "associated with the criminal activity, participated in it, and acted to help it succeed." *Sanders*, 952 F.3d at 277 (internal quotation omitted) (citing 18 U.S.C. § 2).

"It is not necessary that one charged as an aider or abettor commit the overt acts that accomplish the offense or that he have knowledge of

---

[8] Gholar's indictment explicitly cites the federal aiding-and-abetting statute, 18 U.S.C. § 2(a). ROA.181. Gholar's judgment of conviction describes her offenses of conviction as "Conspiracy to commit wire fraud" and "Aiding and abetting wire fraud." ROA.422.

the particular means his principals employ to carry out the criminal activity." *Sanders*, 952 F.3d at 277 (internal quotation omitted). "Similarly, there needn't be proof that the defendant was present when the crime was committed or that he actively participated therein." *Id.* (internal quotation omitted). "Instead, liability under 18 U.S.C. § 2 'results from the existence of a community of unlawful intent between the aider or abettor and the principal.'" *Id.* (quoting *United States* v. *Austin*, 585 F.2d 1271, 1277 (5th Cir. 1978)).

"'Typically, the same evidence will support both a conspiracy and an aiding and abetting conviction.'" *Sanders*, 952 F.3d at 278 (quoting *United States* v. *Scott*, 892 F.3d 791, 799 (5th Cir. 2018)).

### B. Legal standards regarding interstate wire transmissions.

"A person causes the use of an interstate wire under the [wire fraud] statute when he does an act with knowledge that the use of the wire will follow in the ordinary course of business, or where such use can reasonably be foreseen." *United States* v. *Fatani*, 125 F.4th 755, 759 (5th Cir. 2025) (internal quotation omitted) (citing *Pereira* v. *United States*, 347 U.S. 1, 8–9 (1954)). An aider and abettor of wire fraud need not personally send an interstate wire communication, or cause such a

communication to be sent, to sustain a conviction. *Sanders*, 952 F.3d at 278. "Instead, the government needs only to show that he assisted the actual perpetrator of the wire fraud crimes while sharing the requisite criminal intent." *Id.* (internal quotation omitted).

To satisfy the use-of-interstate-wire-communications element of wire fraud, "[a]ll that needs to move across . . . state lines is a writing, sign, signal, picture, or sound that furthers the fraud." *del Carpio Frescas*, 932 F.3d at 329 (internal quotation omitted). "[T]he wire communication need not be an essential element of a scheme to defraud but may instead be incident to an essential part of the scheme, or a step in the plot." *Fatani*, 125 F.4th at 759 (internal quotation omitted) (citing *United States* v. *Dowl*, 619 F.3d 494, 499 (5th Cir. 2010)).

"For a defendant to be convicted of wire fraud, it is sufficient that the defendant could reasonably have foreseen the use of the wires; *the interstate nature of the wire communication need not have been reasonably foreseeable*." *United States* v. *Richards*, 204 F.3d 177, 207 (5th Cir. 2000) (emphasis added) *overruled on other grounds by United States* v. *Cotton*, 535 U.S. 625 (2002). Where wire communications are "commonly" used for a particular commercial purpose, their use is

reasonably foreseeable. *United States* v. *Mann*, 493 F.3d 484, 493 (5th Cir. 2007) (use of wire transfers to bank account was reasonably foreseeable to defendant "though he had no role in establishing the bank account, because money is commonly paid over long distances by means of wire transfer"); *see also United States* v. *Blankenship*, 746 F.2d 233, 242 (5th Cir. 1984) (use-of-mail element satisfied even where defendant "did not contemplate that the mail would be used in the fraudulent scheme" and the fact that the relevant documents furthering the scheme "could have been delivered . . . by some other means").

Communications intended to "lull [a victim] into a false sense of security" or to "facilitate concealment of the [fraud] scheme" qualify as communications in furtherance of the scheme. *United States* v. *Lane*, 474 U.S. 438, 452-53 (1986)[9]. That is true because "all frauds depend upon avoiding detection for at least a period of time sufficient to allow the perpetrator to escape apprehension." *United States* v. *Allen*, 76 F.3d 1348, 1363 (5th Cir. 1996). Accordingly, this Court has "recognized that actions taken to avoid detection, or to lull the fraud victim into

[9] Although *Lane* involved the mail fraud statute, "because the mail and wire fraud statutes share the same language in relevant part, the same analysis applies to each." *United States* v. *Mills*, 199 F.3d 184, 188 (5th Cir. 1999).

complacency, can further the fraud, even after the victim" has been defrauded of the object of the scheme. *Id.*

### C. Applying these legal standards, Gholar's sufficiency challenge fails.

Gholar's opening brief does not cite or analyze the elements of substantive wire fraud and does not address the standard for proving aiding-and-abetting liability. She does not argue—much less show—that the evidence was insufficient to prove both that a scheme to defraud existed and that she had specific intent to defraud. And, regarding aiding-and-abetting liability, she does not challenge the sufficiency of the evidence establishing that she associated with the criminal bail-bond scheme, participated in it, and acted to help it succeed. Rather, Gholar challenges the sufficiency of the evidence on a single, narrow ground. She asserts that "[t]he evidence [wa]s insufficient to prove an interstate nexus at the time of the offense" because it did not support the conclusion that she "transmitted or caused to be transmitted by way of wire communications, in interstate commerce, any writing for the purposes of executing [the bail bond] scheme." Appellant's Br. 14.[10] That argument

[10] Page citations to appellant's brief refer to the pagination in the ECF header.

fails.

As an initial matter, to the extent that Gholar argues that the government was required to show that *she personally* sent or caused the sending of interstate wire communications, she is wrong. The authority discussed above establishes that, after joining the bail-bond fraud scheme, Gholar was "liable for any wire communication which subsequently t[ook] place or which previously took place in connection with the scheme." *Sanders*, 952 F.3d at 277. The government was required only to show that Gholar "participated in the scheme to defraud, not that [s]he took part in every aspect of that scheme." *Id.* Further, because the evidence overwhelmingly established the "community of unlawful intent" between Gholar (as an aider-and-abettor) and her coconspirators (and principals) at Aable Bail Bonds, like Mary Brown, the government was not required to show that Gholar "ha[d] knowledge of the particular means h[er] principals employ[ed] to carry out the criminal activity."[11] *Id.*

The record contains ample evidence from which a rational trier of

---

[11] Gholar's assertion that "[i]t is fantastical to suggest that the subsequent offsite duplication of data storage was foreseeable to her and her participation in a completely local scheme . . . when the offending parties were finagling the bonds" thus misses the mark. Appellant's Br. 16.

fact could conclude that Aable's transmission of the fraudulent co-signer documents to Bond Pro's servers in Georgia was intended, at least in part, to "facilitate concealment of the [fraud] scheme" and to "lull" the victim, Financial Casualty, "into a false sense of security" that Aable was properly discharging its fiduciary duties both regarding recordkeeping and in ensuring that Nicholas Yoder's bond was supported by properly qualified co-signers. *See Lane*, 474 U.S. 438 at 452-53.

Indeed, particularly when viewing the evidence in the light most favorable to the prosecution, it is difficult to see how a rational trier of fact could conclude that Aable's transmittal of the documents to Bond Pro was intended for a purpose other than papering up the record to conceal the fact that Nicholas Yoder's bond had been improperly issued based on unqualified co-signers. In the light most favorable to the verdict, the evidence showed that, given the ordinary course of business at Aable, Mary Brown caused Bond Pro to retain fraudulent co-signer applications and materials supporting the issuance of Yoder's bond *that Brown knew were falsified*. Because the applications and supporting documents were falsified, the district court could reasonably conclude that they served no valid commercial purpose. If Nicholas Yoder absconded on his $335,000

bond, the falsified applications supported by fraudulent co-signer income information would be of no use to Financial Casualty in attempting to recover from the co-signers. Rather, there was abundant evidence from which a reasonable fact finder could conclude that the value of transmitting the fraudulent documents to Bond Pro lay in concealing the fraud committed by Aable, Gholar, and their confederates by making it appear that Yoder's bond had been properly approved and issued in the normal course of business.

Seeking to avoid this straightforward conclusion, Gholar tries to paint the bond scheme as ending the moment that Nicholas Yoder was released on the fraudulently obtained bond in late December 2025. Appellant's Br. 16; *see* ROA.550-55 (discussing ROA.1508). The district court, however, was free to reject that claim and to reasonably conclude that the scheme to fraudulently obtain Yoder's release on bond encompassed not only his initial exit from jail, but also his remaining free on bond. The court could also reasonably conclude that Yoder's continued release on bond hinged on maintaining the illusion that his bond was validly issued and properly supported, not only on the moment he stepped out of jail, but also as long as he remained free on bond. Because

the trial evidence amply supported the conclusion that Aable's storage of the co-signer materials at Bond Pro was to further the fraud by maintaining this illusion, Gholar's sufficiency challenge fails.

## CONCLUSION

For the foregoing reasons the United States respectfully requests that this Court affirm the judgment of the district court.

Respectfully submitted,

AARON F. REITZ
United States Attorney

CARMEN CASTILLO MITCHELL
Chief, Appellate Division

s/ Jason Smith
Jason B. Smith
Assistant United States Attorney
United States Attorney's Office
Southern District of Texas
1000 Louisiana, Ste. 2300
Houston, Texas 77002
(713) 567-9102

ATTORNEYS FOR APPELLEE

**CERTIFICATE OF SERVICE**

I, Jason Smith, Assistant United States Attorney, hereby certify that on September 4, 2026, *Plaintiff–Appellee's Brief* was electronically filed and served on counsel of record via this Court's ECF system. Upon notification that the electronically filed brief has been accepted as sufficient, and upon the Clerk's request, seven paper copies of this brief will be submitted to the Clerk. *See* 5th Cir. R. 25.2.1; 5th Cir. R. 31.1; 5th Cir. ECF filing standard E(1).

*/s/ Jason Smith*
Jason Smith
Assistant United States Attorney

# CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 4,563 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 365 in Century Schoolbook, 14-point font for text and 12-point font for footnotes.

3. This brief complies with the privacy-redaction requirement of 5th Cir. R. 25.2.13 because it has been redacted of any personal data identifiers.

4. This brief complies with the electronic-submission requirement of 5th Cir. R. 25.2.1 because it is an exact copy of the paper document.

5. This brief has been scanned for viruses with the most recent version of McAfee Endpoint Security and is free of viruses.

*/s/ Jason Smith*
Jason Smith
Assistant United States Attorney
Dated: September 4, 2026